STATE OF NORTH CAROLINA v. JAMES HANOVER GRISSOM THOMPSON

No. 56

(Filed 10 March 1971)

1. Criminal Law § 66— in-court identification of defendant — sufficient evidence of prior identification

Trial court properly allowed an armed robbery victim to make an in-court identification of the defendant as the perpetrator of the robbery, the victim having had a good opportunity to view the defendant both during the robbery and at the scene where his goods were recovered.

2. Criminal Law § 66— in-court identification of defendant — testimony by cab driver

A cab driver who carried the defendant to the locality where an armed robbery was committed later that night was properly allowed to identify the defendant at the trial for armed robbery.

3. Robbery § 3— armed robbery prosecution — admission of stolen articles

The saddle, radios, guns, TV set, typewriter, adding machine, diamond ring, and other articles that were forcibly removed at gunpoint from a home and that were recovered from defendant's bedroom in a boarding house a few hours later, *held* properly admitted as exhibits in the trial of defendant for armed robbery, the articles being so unusual in character and in combination as to raise an overwhelming inference of defendant's guilt.

4. Searches and Seizures § 1; Arrest and Bail § 3 — arrest without warrant — seizure of stolen goods — probable cause

　　Where officers sitting in the living room of defendant's boardinghouse could look through an open door into the defendant's bedroom and see therein the articles that had been forcibly removed at gunpoint from a home some four hours earlier, the officers had probable cause to arrest the defendant without a warrant for armed robbery; consequently, the seizure of the articles following the arrest was lawful.

5. Criminal Law § 170— argument of solicitor — statement that defendant and witnesses were lying — harmless effect

　　It was improper for the solicitor to state, during his argument to the jury, that he was of the opinion that the defendant and his witnesses were lying; however, in view of the overwhelming evidence of defendant's guilt, the solicitor's indiscretion did not warrant a new trial.

APPEAL by defendant from *Martin (Harry C.), J.* August 12, 1970, Schedule A Session, MECKLENBURG Superior Court. This case was argued at the Fall Term as No. 92.

The defendant, James Hanover Grissom Thompson, was charged by grand jury indictment, proper in form, with the armed robbery of Hugh Perry Caldwell, feloniously taking from him articles of personal property of the total value of $1956.00.

Upon a showing of indigency, William F. Hamel was appointed by the court to represent the defendant.

At the trial the State's evidence disclosed that on April 8, 1970, Hugh Perry Caldwell lived on David Cox Road outside the city limits of Charlotte. At that time his wife was away from home. Bruce Blackman, a Negro boy of seventeen, occasionally did work at odd jobs around the house for Caldwell. On that date Caldwell requested Blackman to have his girl friend come out and clean up the house and prepare the evening meal. Blackman's girl friend is a sister of the defendant Thompson. She brought two other girls to the Caldwell house. During the evening meal and its preparation there was a great deal of drinking, especially by Caldwell. When the evening meal was over about 9:30, Blackman and the girls left.

Approximately at midnight, Blackman returned. Caldwell admitted him and instructed him to go to bed in an upstairs room. Within a few minutes Caldwell answered another knock at the door and admitted a colored male who struck him on the side of the head with a pistol, inflicting serious injuries.

While he was down, the intruder bound and tied him with a telephone wire. Blackman came down from the bedroom and the intruder went through the motion of tying him also. After the intruder left, Blackman untied himself and then untied Caldwell who notified the police.

After checking with the officers, the witness, Caldwell, found that his wife's diamond ring, one rifle, one shotgun, two radios, one TV set, one adding machine, one western type saddle and the automobile were missing.

Officer Smith of the County Police Department, suspecting that Blackman was implicated in the hold-up, questioned him and from the leads obtained from Blackman, the officers, accompanied by Caldwell and Blackman, appeared at the Miller boardinghouse in Charlotte at five o'clock on the morning of April 9. The owner of the boardinghouse invited the officers into the living room. Officer Smith testified: "I asked her who lived there. We were standing right there in the living room. From where we were standing you could see this saddle at the foot of a bed in the next room, and TV and radios around the bed. . . . After we observed a portion of these items, the saddle, and radios, we entered the room. The door was open. . . . James Thompson was in bed. We grabbed him, got the gun." We placed him under arrest for robbery.

The officers found in the room numerous articles identified by Caldwell as having been taken from his home about four hours earlier. (In addition to the other articles taken, the intruder took something less than $100.00 in cash.) At the time of the arrest they read from a card "the defendant's rights." Mr. Caldwell, who was with the officers, identified Thompson as the person who assaulted him with a pistol, bound him with wire, and took his property. Caldwell also identified various articles and the State introduced them in evidence as exhibits.

The defendant testified: "On the morning of April 9, 1970, the police came to my house at about 5 a.m. . . . I did not invite them in the house . . . . I went to sleep that night at about one o'clock . . . . I woke up the next morning just before daybreak . . . . I started to the restroom . . . . I stumbled on an adding machine or typewriter one, right there in the door, just as I went to go out. It was all inside my room. . . . I started looking at the stuff to, trying to figure out where it came from. The

first thought that came to my mind was they had broke into someone's house or something and brought it there, so I took the guns out of the cases. I looked at them to see whether they were loaded. . . . Then I was still messing with the stuff, looking in all the boxes. I found a pasteboard box also beside the wall with a wallet in it that had been ripped open . . . and a diamond ring was in the box . . . . I found the pistol and this money laying on the table. . . . I found the money and put it in the change purse and took the pistol and laid it under my pillow. . . . I didn't know where the money came from. The only thing I could figure was that they may left it there for me to maybe keep this merchandise, maybe lock my room and don't say anything about it. . . . The next thing I knew, my room door was being cracked. . . . The officers did not ask me if you could search my room. They did not show me a search warrant."

Bruce Blackman, as a witness for the defendant, testified in substance: He and the three girls left the Caldwell home about 9:30 on the night of April 8 and went to the girls' home. After about an hour he went to the defendant's room at the Miller boardinghouse. "Jackie Stewart was there too and I don't know the other dude's name. . . . I left with Jackie Stewart and his friend. They were taking me out to Caldwell's. . . . These boys let me out, at Caldwell's house. They drove up in the driveway. They did not come in with me."

Blackman further testified that he went to bed upstairs and before he went to sleep he heard Mr. Caldwell call his name. He came downstairs. "As I was turning the corner, Jackie had Caldwell by the shirt and had the gun . . . and he put the gun up in my face . . . and told me not to move. . . . (S)o Caldwell tried to get up . . . so Jackie hit Caldwell up side the head with the pistol . . . . I was still tied. I was laying in the hallway." He (Caldwell) was not tied up then. The witness could see Jackie and the dude ransacking the house and carrying things outside. " . . . I could see lights . . . and they pulled out of the yard."

The State offered into evidence the articles found in Thompson's room. The defendant objected on the ground the search was without warrant and was illegal. The defendant further objected to the introduction of the recovered articles on the grounds the officers arrested him without a warrant and without probable cause; and hence the items identified by Mr.

Caldwell as having been taken from him were not taken incident to a lawful arrest.

In ruling on the defendant's motion to suppress on the foregoing grounds, the trial judge found facts and concluded the evidence was admissible. The jury returned a verdict, guilty as charged. From the judgment of imprisonment, the defendant appealed.

*Robert Morgan, Attorney General, Thomas B. Wood, Assistant Attorney General for the State.*

*William F. Hamel for the defendant-appellant.*

HIGGINS, Justice.

The appellant assigns as error the court's failure to exclude:

(1) The in-court identification of Thompson by the victim, Caldwell; (2) The articles recovered from the defendant's room on the alleged grounds they were obtained by an illegal search. The defendant also assigned as error: (1) The refusal of the court to direct a verdict of not guilty at the close of the evidence; (2) The failure to order a mistrial because of the solicitor's argument in which he expressed his personal opinion that the defendant and his witnesses were lying.

[1, 2] Mr. Caldwell had good opportunity to view his assailant during the robbery. He next saw the defendant about four hours later at his boardinghouse. The evidence (direct and circumstantial) tended to remove all reasonable probability of a mistaken identity. *State v. McPherson*, 276 N.C. 482, 172 S.E. 2d 50. Likewise untainted was the identification by Price, the cab driver, who picked up the defendant and Blackman and carried them to David Cox Road where he left them about midnight on April 8. These identifications strongly complement and support each other. *Russell v. U.S.*, 408 Fed. 2d 1280; *State v. Wright*, 274 N.C. 84, 161 S.E. 2d 581. The arresting officers had knowledge of these facts at the time of the arrest.

[3] The saddle, radios, guns, TV set, typewriter, adding machine, diamond ring, and other articles recovered from the defendant's room at the boardinghouse in less than four hours from the time they were forcibly removed at gun point from the Caldwell home were properly admitted in evidence, unless,

of course, the officers recovered possession as a result of unlawful search or incident to unlawful arrest. The articles stolen were unusual in character and in combination, and when found so soon after the taking, the inference of the possessor's guilt is overwhelming unless explained. A saddle in a bedroom is out of the ordinary. The officer testified that Bruce Blackman admitted he helped set up the robbery and that he and Thompson went to the Caldwell home in a cab. Bruce Blackman testified that he told Officer Smith that he went to the Caldwell home in a cab. He told Officer Andrews that James Thompson, the defendant, might be able to give some information concerning Jackie Stewart and his friend whom he had seen at Thompson's boardinghouse.

[4] Mrs. Miller, owner of the boardinghouse, invited the officers into the living room. While she was talking to them, Officer Robinson looked through an open door into the defendant's bedroom. There he saw a western type saddle, radios and a TV set. Thereupon the officers entered through the open door and found the defendant in bed armed with a pistol and his bed surrounded by the purloined articles. The possession of these unusual articles, within less than five hours after they were taken, furnished the officers ample evidence to warrant the defendant's arrest. "In determining probable cause, all the information in the officer's possession, fair inferences therefrom, and observations made by him, are generally pertinent; and facts may be taken into consideration that would not be admissible on the issue of guilt." 5 Am. Jur. 2d, Arrest, § 48. See *State v. Roberts,* 276 N.C. 98, 171 S.E. 2d 440.

"When the constitutional validity of an arrest is challenged, it is the function of a court to determine whether the facts available to the officers at the moment of the arrest would 'warrant a man of reasonable caution in the belief' that an offense has been committed." *Beck v. Ohio,* 379 U.S. 89, 13 L. Ed. 2d 142, 85 S.Ct. 223.

In this case the trial judge believed the testimony of the officers and disbelieved the testimony of the defendant's unreasonable explanation that the articles were unloaded in his room while he was asleep. The articles introduced in evidence were recovered by a lawful search and incident to a lawful arrest. The trial court findings were supported by the evidence.

---

---

The evidence made out a strong case, and amply supported the guilty verdict. The motions to suppress were properly overruled.

[5]  The case on appeal contains the following: "THE COURT: Let the record show that during the Solicitor's argument to the jury, he stated that he was of the opinion that the defendant and the defendant's witnesses were lying. The defendant objected. Objection overruled. Exception No. 13."

The solictor's argument was improper. He had not been a witness. He had the right to argue the evidence, and the legitimate inferences which the jury might draw from that evidence. But his private opinion, that the defendant and his witnesses were lying, was a step out of bounds. In expressing his private opinion, the solicitor was not well advised. Perhaps, too, the judge would have been better advised if he had sustained the objection and cautioned the jury not to permit the solicitor's personal opinions to have weight against the defendant. However, in view of the overwhelming evidence of guilt, the solicitor's indiscretion was of small moment. While it would appear from the record before us that the objection to the argument should have been sustained; however, this court did not hear the argument of defense counsel. The presiding judge did hear it. The solicitor's inadvertence does not appear of sufficient moment to warrant a new trial. "The manner of conducting the argument of counsel, the language employed, the temper and tone allowed, must be left largely to the discretion of the presiding judge. He sees what is done, and hears what is said. He is cognizant of all the surrounding circumstances, and is a better judge of the latitude that ought to be allowed to counsel in the argument of any particular case. It is only in extreme cases of the abuse of the privilege of counsel, and when this is not checked by the court, and the jury is not properly cautioned, this Court can intervene and grant a new trial." *State v. Barefoot,* 241 N.C. 650, 86 S.E. 2d 424; *State v. Bryan,* 89 N.C. 531; *State v. Underwood,* 77 N.C. 502.

Just cause to upset the verdict and judgment does not appear in this record.

No error.