STATE OF NORTH CAROLINA v. CURTIS EUGENE SMITH

No. 10

(Filed 10 June 1971)

1. Criminal Law § 102— abusive argument by solicitor — duty of court

When the prosecutor becomes abusive and injects his personal views and opinions into his jury argument, he violates the rules of fair debate, and it becomes the duty of the trial judge, especially in a capital case, to intervene to stop improper argument and to instruct the jury not to consider it.

2. Criminal Law § 102— improper jury argument by solicitor — new trial

Defendant convicted of rape is entitled to a new trial by reason of the solicitor's inflammatory and prejudicial argument to the jury, including the solicitor's assertion that he knew when and when not to ask for conviction in a capital case, his characterization of defendant as being "lower than the bone belly of a cur dog" and a "liar," and his statements that defendant's character and reputation aren't "worth a darn" and that he "didn't believe a living word" of what defendant says about the case.

APPEAL by defendant from *Bryson, J.,* November 3, 1969 Schedule "A" Session, MECKLENBURG Superior Court.

In this criminal prosecution the defendant, Curtis Eugene Smith, was charged in the following bill of indictment:

State v. Smith

"THE JURORS FOR THE STATE UPON THEIR OATH PRE-SENT, That Curtis Eugene Smith in Mecklenburg County, on or before the 8th day of May 1969, with force and arms, at and in the county aforesaid, did, unlawfully, wilfully and feloniously ravish, rape and carnally know Barbara Freeze Dobbin a female, by force and against her will against the form of the statute in such case made and provided and against the peace and dignity of the State."

After arraignment and a plea of not guilty, a jury accepta-ble to both parties, was empaneled. The State offered evidence tending to show the following:

On and prior to May, 1969, Barbara Freeze Dobbin, age 23, and her husband lived at 320 Riley Avenue in Charlotte. Both had daytime jobs for different employers in the city. Mrs. Dobbin worked for a motor company near her apartment. As was her custom, she went home during the lunch hour. On May 8, 1969, while she was in the apartment alone, the defend-ant, whom she did not know, appeared at the door and asked "Are you Jean." On being told she was not Jean and did not know anyone by that name, the defendant drove away. A few minutes thereafter he returned, knocked on the door and re-quested permission to use the telephone to get better directions on how to locate Jean.

The witness admitted the defendant who dialed numbers on the telephone apparently without answers. The witness be-came uneasy and told the defendant it was time for her to return to work. The defendant drew a knife, cautioned her not to scream or try to resist, admonishing her, "If you try to fight me, I will have to hurt you." Under threat of the open knife and at his order, she disrobed and he forced her to engage in an act of intercourse with him. Before leaving the apartment, the defendant ordered her not to leave the room until he was gone and threatened that if she made any disclosure as to what had happened, he would kill her. After the defendant left, Mrs. Dobbin, visibly agitated, returned to her place of employment and made a disclosure as to what had taken place, and had the officers notified.

The defendant testified in his own defense. He admitted being in the Dobbin apartment on May 8th and while there had intercourse with the prosecuting witness. He said the act was

with her consent. He testified he did not own or carry a knife. Members of his family testified he owned only a hunting knife which was packed in his duffel at home. Three witnesses testified to the defendant's good character.

The case was argued before the jury by defense counsel and by the solicitor. The jury returned a verdict of guilty with a recommendation that punishment be imprisonment for life. From the judgment in accordance with the verdict, the defendant gave notice of appeal. A dispute arose between the defendant and his counsel who was Court-appointed. Other counsel appointed by the Court prosecuted a belated appeal.

*Robert L. Morgan, Attorney General by Eugene A. Smith, Assistant Attorney General, and Walter E. Ricks III, Associate Attorney for the State.*

*Craighill, Rendleman & Clarkson by John R. Ingle for defendant appellant.*

HIGGINS, Justice.

As a part of the case on appeal the defendant has placed in the record what purports to be the full text of the solicitor's argument to the jury. To many portions of the argument the defendant noted exceptions. These were inserted in the record of the case on appeal. Objection seems not to have been made to the Court during the delivery of the argument.

We record here some of the quotes from the solicitor's argument: "I know when to ask for the death penalty and when not to. This isn't the first case; it's the ten thousandth for me. . . . I did . . . have in this courtroom three weeks ago a man charged with a sexual assault . . . who was as innocent of it as I. . . . I hope my reputation in this community where you elected me to this office that I try not an innocent man . . . . When I found that out about that case . . . no one was on his feet faster than I to come to his defense . . . . I wanted to tell you about that and get back to the facts of this case."

In characterizing the defendant, the solicitor said that a man who would do what this woman says this defendant did is "lower than the bone belly of a cur dog."

During the State's evidence, the investigating officer had quoted the defendant as saying that he worked for his employer,

the bus company, on May 8, 1969. The solicitor said: "Liar! No, Mr. Smith, State's Exhibit #2 says you were not working that day." Exhibit #2 introduced in evidence by the State was the bus company's work record showing that on May 8, 1969, the defendant began work at 5:43 a.m., was off duty from 9:26 a.m. until 2:22 p.m. and was checked out at 5:14 p.m.

In discussing the defendant's evidence of his good character the solicitor said: "I don't care who they bring in here . . . to say to you that his character and reputation in the community in which he lives is good. I tell you it isn't worth a darn. . . . I don't believe a living word of what he says about this case, members of the jury . . . . "

[1] The foregoing are the more flagrant of the solicitor's transgressions. Too much of his argument, however, was pitched in the same tone. When the prosecutor becomes abusive, injects his personal views and opinions into the argument before the jury, he violates the rules of fair debate and it becomes the duty of the trial judge to intervene to stop improper argument and to instruct the jury not to consider it. Especially is this true in a capital case. When it is made to appear the trial judge permitted the prosecutor to become abusive, to inject his personal experiences, his views and his opinions into the argument before the jury, it then becomes the duty of the appellate court to review the argument. "In these circumstances prejudice to the cause of the accused is so highly probable that we are not justified in assuming its non-existence." *Berger v. United States,* 295 U.S. 78, 79 L. ed. 1314, 55 S.Ct. 629. See also *State v. Smith,* 240 N.C. 631, 83 S.E. 2d 656; *State v. Dockery,* 238 N.C. 222, 77 S.E. 2d 664.

In *State v. Miller,* 271 N.C. 646, 157 S.E. 2d 335 (also a Mecklenburg County case), Chief Justice Parker for this Court said: "It is especially proper for the court to intervene and exercise power to curb improper arguments of the solicitor when the State is prosecuting one of its citizens, and should not allow the jury to be unfairly prejudiced against him." See also *United States v. Cotter,* 425 F. 2d 450; *Hall v. United States,* 419 F. 2d 582; *State v. Little,* 228 N.C. 417, 45 S.E. 2d 542; *State v. Correll,* 229 N.C. 640, 50 S.E. 2d 717.

Pertinent to the present inquiry is the opinion of Mr. Justice Sutherland in *Berger v. United States, supra:*

State v. Smith

"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor— indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none."

[2] When the solicitor's tirade before the jury is examined in the light of the foregoing rules, its inflammatory and prejudicial effect becomes manifest. The intemperance, the assertions of personal belief, the claim that the solictor knows when and when not to call for a conviction in a capital case, require this Court, in spite of its reluctance, to award the defendant an opportunity to go before another jury. The trial judge who heard the argument and failed to intervene on his own motion, was derelict in his duty.

This Court now orders that the verdict and judgment be set aside and that there be a

New trial.