An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-1313

NORTH CAROLINA COURT OF APPEALS

Filed: 5 August 2014

STATE OF NORTH CAROLINA

v.

DANIEL DARNELL DAVIS

Forsyth County
No. 10 CRS 31069, 61853-54

Appeal by Defendant from Judgments entered 5 June 2013 by Judge Gary M. Gavenus in Forsyth County Superior Court. Heard in the Court of Appeals 4 June 2014.

> *Attorney General Roy Cooper, by Assistant Attorney General M. Denise Stanford, for the State.*

> *Leslie C. Rawls for Defendant.*

STEPHENS, Judge.

*Factual Background and Procedural History*

On 4 April 2011, Defendant Daniel Darnell Davis was indicted on one count of possession of a firearm by a felon, one count of possession with intent to sell and deliver cocaine, one count of possession of marijuana up to one-half ounce, one count of possession of drug paraphernalia, and having attained the

status of being an habitual felon. The case came on for trial on all charges except the habitual felon status on 3 June 2013. Guilty verdicts were rendered on these charges the following day. The case for the charge of being an habitual felon came on for trial on 5 June 2013, and a guilty verdict was rendered the same day. The State's evidence tended to show the following:

On 15 September 2010, Corporal Hashon Geddings of the Winston-Salem Police Department received a Crime Stoppers tip regarding possible criminal activity at 419 Byerly Street. After receiving the Crime Stoppers tip, Corporal Geddings did some research to get "background information on the place," including "pull[ing] up history on [the person accused], [to] see what . . . they've been involved in" and "pull[ing] up the map in the area . . . where the location is . . . [to] try to get eyes on the location." He also conducted surveillance and attempted to perform a "knock and talk,"[1] but received no answer. On 22 November 2010, Corporal Geddings and two other officers went to the Byerly Street residence to conduct surveillance. They observed a green car leave the house with one female occupant. Thinking the home's owner, later identified as Defendant, might

---

[1] Corporal Geddings testified that a "knock and talk" is an "attempt to make contact with the residents to . . . prove or disprove the allegations" in a tip.

still be inside, Corporal Geddings and the other officers approached the residence to attempt another "knock and talk." As he walked to the door, Corporal Geddings heard a dog bark to the right of the residence. He also smelled marijuana burning and noticed someone looking out a window. Corporal Geddings knocked on the front door, but no one answered.

Corporal Geddings left the residence. He and the other officers continued to conduct surveillance in an unmarked car from a "covert location." While surveilling the residence, Corporal Geddings began to type an application for a search warrant. At the same time, a car pulled into the driveway. Corporal Geddings and the two other officers waited a few seconds to allow the driver to approach the home. They then pulled into the driveway behind the car. The driver, Nekole Friend, approached the home, and Defendant opened the front door. While Defendant and Friend were standing at the door, Corporal Geddings flashed his flashlight in their direction. Defendant closed the door, and Friend began to walk away. Corporal Geddings approached the door, and Defendant came back out. Defendant stood between Corporal Geddings and the front door of the residence. Corporal Geddings was unsure if there were other people within the residence. Based on this

uncertainty and the smell of burning marijuana, Corporal Geddings and the other officers detained Defendant. All of the officers then approached the residence to begin a protective sweep of the home "to ensure the[ir] safety . . . [and] to make sure no one ha[d] weapons." As the officers entered the residence, Defendant yelled out that they could not go into his home without a warrant. Defendant did not object to this testimony at trial.

While executing the sweep, Corporal Geddings and the other officers smelled a strong odor of burnt marijuana and observed burnt marijuana cigarettes and drug paraphernalia. Following the sweep, the officers detained Defendant inside the residence for approximately two hours while Corporal Geddings and another officer left the residence to obtain a search warrant from the magistrate.

When Corporal Geddings and the other officer returned with the warrant, an officer read it aloud to Defendant. After the officer read the search warrant, Defendant began to speak to the officers. Corporal Geddings interrupted Defendant and read him his *Miranda* rights. Defendant waived his *Miranda* rights, continued speaking, and told Corporal Geddings that he did not answer the door when Corporal Geddings initially knocked because

he was smoking marijuana. Defendant also informed Corporal Geddings that there was marijuana on top of the refrigerator and admitted to having "paraphernalia" in the house. He denied possession of any other contraband.

Approximately "six or seven" officers,[2] including Corporal Geddings, participated in the search of the residence. The officers' search revealed a gun, plastic bags, a razor with white powder residue, mail containing Defendant's name and the 419 Byerly Street address, and an off-white substance, later confirmed to be "cocaine base." "When [the officers] concluded [their] search," Corporal Geddings arrested Defendant and, with another officer, drove him to the magistrate's office. During the ride, Defendant again began to speak with Corporal Geddings and the other officer. Corporal Geddings reminded Defendant of his *Miranda* rights. Defendant acknowledged his rights and kept talking. Defendant admitted that he purchased "the crack that was located in the house" and said that he was selling it to support his family. Upon arrival at the magistrate's office,

---

[2] Corporals Geddings and Mike Ognosky both testified that approximately six or seven officers participated in the search. However, Officer B.E. Wenzel testified that approximately four or five officers participated.

Defendant signed an "adult warning waiver"[3] at the request of Corporal Geddings.

Several months after the search of the residence, Amanda Motsinger, a forensic scientist working at the North Carolina State Crime Lab, tested samples of the substances found at the home. She confirmed that the samples were marijuana and cocaine base.[4]

Defendant did not offer any evidence at trial. During closing arguments, the prosecutor asserted that Defendant's refusal to consent to the search without a warrant was evidence that he was hiding something. Defendant was found guilty by a jury on 4 June 2013 of possession of a firearm by a felon, possession with intent to sell and deliver cocaine, possession of marijuana up to one-half of an ounce, and possession of drug paraphernalia. Defendant was found guilty by a jury of attaining

---

[3] The testimony of Corporal Geddings indicated that the adult warning waiver is a form to document that Defendant was informed of his *Miranda* rights. Corporal Geddings read the form aloud to Defendant. Defendant initialed a number of questions, and the form was signed by Defendant, Corporal Geddings, and one other officer as a witness.

[4] Motsinger tested and confirmed samples of "cocaine base" weighing a total of 27.5 grams and a sample of marijuana weighing 0.5 grams. She further testified that, according to the State Crime Lab's regular procedure, additional samples were not tested because the size of the samples was not sufficient to change the criminal charges against Defendant.

the status of habitual felon on 5 June 2013. Judgments were entered on 5 June 2013. The trial court sentenced Defendant to consecutive terms of 127 to 162 months in prison. Defendant gave notice of appeal in open court.

## *Discussion*

On appeal, Defendant argues that the trial court erred by (1) allowing the testimony of Corporal Geddings that Defendant exercised his constitutional right to refuse a warrantless search of his home and (2) failing to intervene *ex mero motu* when the prosecutor argued that Defendant's statement to the officers who were entering his home to perform the protective sweep was evidence of guilt. We hold that the trial court did not plainly err in allowing the testimony of Corporal Geddings and committed no error in declining to intervene *ex mero motu* during the prosecutor's closing argument.

I. *Testimony of Defendant's Refusal to Consent to the Search of His Home*

At trial, the State presented testimony that Defendant yelled at the officers and told them they could not go into his home without a warrant. Defendant argues that the admission of this testimony was a violation of his constitutional rights. Defendant concedes that he did not object at trial, but contends that the appropriate standard of review is harmless error.

Alternatively, Defendant argues that the admission of the testimony of Corporal Geddings should be reviewed for plain error. We review the trial court's decision for plain error and conclude that the trial court did not plainly err by allowing the testimony of Corporal Geddings.

"It is impermissible [in certain circumstances] for the trial court to admit testimony relating to a defendant's exercise of his [constitutional] right . . . ." *State v. Walker*, 167 N.C. App. 110, 130, 605 S.E.2d 647, 660 (2004), *vacated in part on other grounds*, 361 N.C. 160, 695 S.E.2d 750 (2006). Where the defendant fails to object to the testimony at trial, however, "review is limited to plain error." *Id*. Here, Defendant admits that he did not object to the testimony that he refused a warrantless search of his home. Therefore, the proper standard of review is plain error. *See id.*

Defendant contends that the trial court erred in allowing the testimony of Corporal Geddings that Defendant yelled at the officers because he was exercising his constitutional rights to be free from an unreasonable search. In response, the State asserts that Defendant has not demonstrated how the admission of the testimony of Corporal Geddings constitutes plain error. We agree.

Plain error exists when, "after reviewing the entire record, it can be said the claimed error is a fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done . . . ." *State v. Alexander*, 337 N.C. 182, 196, 446 S.E.2d 83, 91 (1994) (citations, internal quotation marks, and emphasis omitted). Under the plain error standard, this Court "must be convinced that absent the error, the jury probably would have reached a different verdict." *Walker*, 167 N.C. App. at 130, 605 S.E.2d at 661.

In this case, police found Defendant at the house at 419 Byerly Street where marijuana, cocaine, drug paraphernalia, and a firearm were also found. Defendant informed police of the location of the drugs inside the residence and admitted to purchasing the cocaine with the intent to sell it. Mail was found at the residence showing Defendant's name and the 419 Byerly Street address. Together, this constitutes overwhelming evidence of Defendant's guilt. As a result, the jury would not have returned a different verdict even if the testimony regarding Defendant's statement had been excluded. Accordingly, the trial court did not commit plain error by admitting the testimony of Corporal Geddings regarding Defendant's refusal to consent to a warrantless search of his home.

*II.  The Prosecutor's Closing Argument*

Second, Defendant contends that the prosecutor's closing argument was grossly improper because the prosecutor explicitly stated that Defendant's refusal to consent to a warrantless search of his home was evidence of his guilt and because the argument relied on an improper statement of the facts. We are unpersuaded.

Defendant admits that he failed to object to the prosecutor's closing argument at trial. Therefore, Defendant concedes that he must show that the State's argument was "so grossly improper that the trial court abused its discretion by failing to intervene *ex mero motu*." *State v. Roache*, 358 N.C. 243, 296-97, 595 S.E.2d 381, 415 (2004). To meet this standard, Defendant must establish that the State's argument "infected the trial with fundamental unfairness." *Id.* at 297, 595 S.E.2d at 416.

"[A prosecutor] is permitted to argue the facts which have been presented[] as well as any reasonable inferences therefrom . . . ." *State v. Waring*, 364 N.C. 443, 500, 701 S.E.2d 615, 651 (2010) (holding that the prosecutor made a reasonable inference that the defendant's shoe made a mark on the victim where the defendant's statement that he stomped the

victim and the mark on the victim's head were introduced as evidence), *cert. denied*, __ U.S. __, 181 L. Ed. 2d 53 (2011). Some improper comments made during a closing argument do not render an argument grossly improper in the face of overwhelming evidence of the defendant's guilt. *See, e.g.*, *Roache*, 358 N.C. at 297-98, 595 S.E.2d at 416 (holding that the prosecutor's description of the defendant and his accomplice as wild dogs "high on the taste of blood and power over their victims" was improper, but not grossly improper in the face of overwhelming evidence of the defendant's guilt); *State v. Mitchell*, 353 N.C. 309, 326, 543 S.E.2d 830, 841 (2001) (holding that the prosecutor's reference to the defendant's failure to testify may have been error, but was harmless beyond a reasonable doubt in light of overwhelming evidence of the defendant's guilt). The brevity of challenged remarks relative to the entire closing argument and the context in which the remarks are made are both factors to be considered in determining whether improper arguments rise to the level of gross impropriety. *See, e.g.*, *State v. Taylor*, 362 N.C. 514, 537, 669 S.E.2d 239, 259-60 (2008), *cert. denied*, 558 U.S. 851, 175 L. Ed. 2d 84 (2009); *State v. Dean*, 196 N.C. App. 180, 199, 674 S.E.2d 453, 466,

*appeal dismissed and disc. review denied*, 363 N.C. 376, 679 S.E.2d 139 (2009).

Some examples of behavior that render a closing argument grossly improper are substantial name-calling, direct contradiction and insulting of the defense's expert witnesses, arguments based on personal opinion, and allusion to crimes not in evidence. *See State v. Jones*, 355 N.C. 117, 133-34, 558 S.E.2d 97, 107-08 (2002) (holding that the prosecutor made a grossly improper closing argument when he repeatedly degraded the defendant, including one description of the defendant as "lower than the dirt on a snake's belly"); *State v. Sanderson*, 336 N.C. 1, 15-19, 442 S.E.2d 33, 41-44 (1994) (holding that the prosecutor made a grossly improper closing argument when he disparaged defense expert testimony and referred repeatedly to an unrelated murder not in evidence); *State v. Smith*, 279 N.C. 163, 165-66, 181 S.E.2d 458, 459-60 (1971) (holding that the prosecutor made a grossly improper closing argument when he described the defendant as "lower than the bone belly of a cur dog," encouraged the jury to disregard character witnesses, and repeatedly argued his own personal opinion of the defendant's guilt).

> A. *The Prosecutor's Remarks Regarding Defendant's Refusal to Consent to the Search*

North Carolina law bars the use of a defendant's exercise of his or her constitutional right to be free from an unreasonable search to imply guilt. *State v. Jennings*, 333 N.C. 579, 604-05, 430 S.E.2d 188, 200 (observing that it was improper to allow two police officers to testify that the defendant had refused to allow a search of her hotel room and her car before the officers obtained a search warrant, but holding that the testimony was harmless beyond a reasonable doubt), *cert. denied*, 510 U.S. 1028, 126 L. Ed. 2d 602 (1993). In this case, the prosecutor stated in her closing argument that Defendant's refusal to consent to the search of his home was evidence that he was hiding something. Specifically, the prosecutor argued:

> Why is he being so guarded about his residence? And when they do go in the house, he says, "You can't go into my home without a search warrant." Why is he being so protective? Why is he guarding this house? The [S]tate would contend to you the reason he's guarding this house, the reason he didn't come to the door, the reason there's a chain-link fence with a "no trespassing" sign on there, the reason for all of these things, he was hiding something, and the officers found it.

This argument is clearly improper because it states that Defendant's refusal to consent to a search of his home is evidence of his guilt. *Id.*

The prosecutor continued her argument as follows:

> And how do we know [D]efendant lived there? Well, number 1, he had a guard dog. Number 2, he himself stood on the front porch and said, "You can't come into my home," where he lived. [He was] the only person found inside the residence when they search[ed] it. And when the officers did their search of the home, they found — as you all have seen — this mail from the tax collector, and it is addressed to — and I'm just gonna read it exactly — Davis, Daniel Darnell, 419 Byerly Road, here in Winston-Salem. That's how we know [D]efendant lived there. That's how we know this was his residence.
>
> . . . .
>
> And you heard no other evidence — no one else came in and testified and said, "This is my gun." No one else came in and said, "Well, this is my cocaine." No one else even came in and said they live at that residence or they own that residence. You have heard none of that evidence. The only evidence that you've heard is that [D]efendant was out of the house, it was his residence, he lived there, he was there when it was searched. He said, "You cannot come into my home."

Neither of the above arguments were used to imply Defendant's guilt based on his refusal to consent to a search of his home. Even if these statements were somehow improper, however, all three remarks by the prosecutor, taken together, do not rise to the level of grossly improper argument. The prosecutor did not engage in substantial name-calling,

disparagement of expert witnesses, or allusion to prior crimes not in evidence. Further, in all three instances, Defendant's refusal of consent was only one of several factors in the argument the prosecutor was making.

This case is analogous to *Taylor*, where the improper comment made by the prosecutor was a "small part of an otherwise proper argument." 362 N.C. at 536-37, 669 S.E.2d at 259-60. In *Taylor*, the prosecutor inserted his own opinion into his closing argument, saying, "I saw some of you when this statement was read and I know that you didn't believe it, just like I don't." *Id.* at 536, 669 S.E.2d at 259. The prosecutor made this remark in the context of a larger argument that the defendant's testimony was not credible because he changed his story several times. *Id.* at 536-37, 669 S.E.2d at 259. On appeal, our Supreme Court concluded that the prosecutor's remark was not proper, but did not rise to the level of gross impropriety because it was a brief remark relative to the entire closing argument and it was made in the context of an "otherwise proper argument." *Id.* at 536-37, 669 S.E.2d at 259-60.

Here, in each instance where the prosecutor remarked on Defendant's refusal to consent to a warrantless search of his home, it was a brief comment in the context of an otherwise

proper argument. Although improper, the prosecutor's inclusion of Defendant's refusal to consent among a list of factors implying he was hiding something in the house was part of a larger, proper argument that Defendant's behavior was suspicious. When the prosecutor brought up Defendant's refusal to consent later in her argument, it was in the context of reciting the evidence supporting the State's proper argument that Defendant was in possession of the home and its contents, not as an implication of guilt. Further, Defendant freely admitted, after receiving *Miranda* warnings, that he had marijuana in the house, that he purchased the cocaine, and that he intended to sell the cocaine. Defendant was found at the home, referred to the residence as his, and the officers found mail inside the home with his name and the address of the residence on it. As we have already held, this constitutes overwhelming evidence of Defendant's guilt.

In light of the brevity of the prosecutor's improper remarks relative to the entire closing argument, the context of the remarks as part of otherwise proper arguments, and the overwhelming evidence of Defendant's guilt, the improper remarks made by the prosecutor in her closing argument were not so grossly improper as to "render the conviction fundamentally

unfair." *Roache*, 358 N.C at 298, 595 S.E.2d at 416. Accordingly, the trial court did not err by declining to intervene *ex mero motu*.

### B. The Prosecutor's Statement of the Facts

Defendant also argues that the prosecutor's closing argument was grossly improper because she made a statement unsupported by the evidence when she referred to a "guard dog" at the residence. Specifically, Defendant points to the following statement by the Prosecutor: "And how do we know [D]efendant lived there? Well, number 1, he had a guard dog." While this statement is incorrect — Corporal Geddings testified that he heard a dog bark when he approached the residence, not that the dog was a guard dog — it is not grossly improper.

Defendant cites *Sanderson*, *supra*, for the proposition that "injecting nonexistent facts [into the closing argument] is grossly improper." In *Sanderson*, however, the prosecutor directly contradicted facts introduced into evidence, pronounced expert testimony to be "a bunch of hogwash," and falsely implied that the defendant was a suspect in a previous murder not in evidence. 336 N.C. at 16, 442 S.E.2d at 42 (internal quotation marks omitted). Our Supreme Court held that such behavior was grossly improper because it deprived the defendant of "that

fundamental fairness essential to the very concept of justice." *Id.* at 20, 442 S.E.2d at 44 (internal quotation marks omitted).

*Sanderson* is distinguishable from this case. Contrary to the prosecutor in *Sanderson*, the prosecutor in this case did not introduce any facts that were not in evidence. Instead, she made an inference that the dog that barked at Corporal Geddings was guarding the residence. This inference did not deprive Defendant of "fundamental fairness." *See id*. Therefore, the prosecutor's statement that Defendant had a guard dog was not grossly improper, and the trial court did not err by declining to intervene *ex mero motu.*

We find no error in the trial court's decision not to intervene *ex mero motu* during the prosecutor's closing argument. Accordingly, we hold that Defendant received a fair trial free from prejudicial error.

NO ERROR.

Judges STROUD and MCCULLOUGH concur.

Report per Rule 30(e).